# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MELISSA GIBBS,
    *Plaintiff,*

    v.

CITY OF BRIDGEPORT, *et al.*,
    *Defendants.*

No. 3:16-cv-635 (JAM)

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTIONS FOR SUMMARY JUDGMENT

On the night of April 1, 2013, Detective Christopher Borona shot and killed a young man named Bryan Stukes. He shot Stukes shortly after he saw Stukes on a public sidewalk in Bridgeport, Connecticut apparently threatening another man with a rifle. When Detective Borona intervened, Stukes ran away, and Detective Borona pursued him. Stukes dropped his rifle, and Detective Borona shot and killed him some moments later.

The administrator of Stukes' estate has filed this lawsuit against Detective Borona, the Bridgeport police chief, and the City of Bridgeport alleging in principal part that Stukes was the victim of excessive force in violation of the Fourth Amendment. The defendants have now moved for summary judgment. I will grant in part and deny in part their motions. As to the primary issues—whether Detective Borona used excessive force and whether Detective Borona should have qualified immunity—I conclude on the basis of compelling video of the events in question that a genuine issue of fact remains for a jury to decide at trial. When I view the video and other evidence in the light most favorable to plaintiff (as I am required to do when evaluating a motion for summary judgment), I have to conclude Detective Borona knew that Stukes was no longer armed when he fired the shot that killed him. If plaintiff can prove at trial that Detective Borona knew he was shooting an unarmed man, then plaintiff should be permitted

1

to try to convince the jury that the decision to shoot Stukes was objectively unreasonable in violation of the Fourth Amendment, and the Court in turn may consider anew in light of the trial evidence and jury findings whether Detective Borona should be entitled to qualified immunity.

My ruling today is not a conclusion that Detective Borona violated anyone's rights. Detective Borona was pulled in on the spur of the moment to respond to an explosive situation stemming from Stukes' decision to brandish a rifle in a threatening manner on a public sidewalk. My conclusion for now is solely that the facts surrounding Detective Borona's decision after pursuing Stukes to fire the shot that killed him are disputed enough that it should be for a jury to decide what happened at trial.

## BACKGROUND

The relevant events all occur within a few minutes on the night of April 1, 2013, as shown on video recorded by three different surveillance cameras mounted outside Golfinho's Fish Market store on the corner of Pequonnock Street and Benham Avenue in Bridgeport, Connecticut. Two of the cameras show from opposite angles the sidewalk and street area on Pequonnock Street in front of the store. The third camera shows the sidewalk and street area on Benham Street just around the corner from the front of the store. The summary judgment record helpfully includes a single exhibit that combines all three synchronized video feeds, along with an overlay of contemporaneous police radio transmissions and audio of a 911 call that was made to the police. *See* Ex. A-1. My factual recitation below is based principally on what I can see and hear in the video, as reasonably interpreted in the light most favorable to plaintiff. To the extent that I recount facts below that are not either shown or heard in the video, these facts are drawn from elsewhere in the record to the extent that plaintiff has either admitted or not disputed them.[1]

---

[1] Apart from the video, I have relied on facts that the parties do not dispute as set forth in their respective local rule fact statements. *See* Docs. #103-2 and #107-2. The parties devote significant effort to describing events that

The video shows a man named Anthony Davis on the sidewalk near the Golfinho's store while placing a 911 call to the police. Ex. A-1 at 9:46:53. He told the dispatcher that a man named "Bryan" (who turned out to be the decedent, Bryan Stukes) was trying to shoot him with a rifle.[2] Davis walked up to the front of the store, pointed inside, and asked in a loud voice: "Is there an officer there?" *Id.* at 9:47:05. Davis then walked away from the store entrance and stood in the middle of Benham Avenue looking down the street while continuing to talk to the dispatcher. *Id.* at 9:47:51.

The video then shows Stukes and his girlfriend walking quickly up Benham Avenue toward Davis, while Davis moved out of the street and on to the sidewalk in front of the store. *Id.* at 9:47:58. Just as he reached the corner of Benham and Pequonnock, Stukes pulled out from his pants a long rifle. *Id.* at 9:47:58. After he then rounded the corner heading toward Davis who was in front of the store, Stukes held the rifle horizontally at a slightly downward angle, and he was within about six feet of Davis who stood by the curb in front of the store and who continued to talk to the police on his phone. *Ibid.* Stukes then advanced to just about two feet away from Davis, while Davis in turn taunted him, saying "Shoot me!" repeatedly. Stukes' girlfriend came up from behind to separate the two men. The barrel of the rifle was mostly pointing at about knee level in the direction of both Davis and Stukes' girlfriend, although the video shows that at one point the barrel was briefly raised to the level of Davis's stomach. *Ibid.*

Stukes' girlfriend then managed to push Stukes away from Davis and back toward the corner of Benham Avenue. *Id.* at 9:48:09. But she did not succeed in wresting the rifle away

---

occurred earlier in the day and outlining the origins of the conflict between Stukes and Davis. Plaintiff likewise devotes time to describing Stukes' alleged motives and the fact that the rifle Stukes was carrying was not actually loaded. Because none of these facts were or should have been known to Detective Borona, there is no need for me to recite them here. Instead, I focus on facts that are properly germane to an evaluation of Detective Borona's decision to fire his gun at Stukes.

[2] It is undisputed that Detective Borona was neither privy to nor learned at the time what Davis was telling the dispatcher.

from him. *Id.* at 9:48:20. She then turned around and approached Davis who was now standing by the curb slightly to the right of the front door of the store. *Id.* at 9:48:23. Stukes in turn went back again to confront Davis. *Id.* at 9:48:24–25. He now held the rifle on the side of him that faced the front door of the store. During this second approach, Stukes held the rifle in both hands and held it horizontally at a slightly downward angle. *Id.* at 9:48:25.

In the meantime, Detective Borona happened to be inside Golfinho's store on a coffee break while on duty. He was armed with a Smith & Wesson handgun and wore a badge on his hip but was not in police dress uniform. He testified at his deposition that while he was in the back of the store getting coffee from a coffee machine he heard someone scream that there was a man outside with a gun. Doc. #103-6 at 8. He went to the front of the store, saw Stukes outside holding a rifle in a threatening manner, and he then drew his own handgun and went outside to confront Stukes. *Id.* at 8–13.

Detective Borona then opened the door of the store with his gun drawn. Ex. A-1 at 9:48:24–25. At that point, Stukes was turned away from the door, facing Davis who was at the curb. But Stukes suddenly turned to his right to see the detective emerging from the door behind him. *Id.* at 9:48:25. Detective Borona was holding his handgun aimed at Stukes as he came out onto the sidewalk. Stukes swiveled toward Detective Borona, still with the rifle held low at a slightly downward angle, and he swung the rifle across Detective Borona's path as he turned to run back from the direction he had come toward the corner of Benham Avenue. *Id.* at 9:48:27.

Although the rifle swung across Detective Borona's path, Stukes did not stop to point the rifle at Detective Borona or fire the rifle at any time. By the time that Detective Borona had emerged from the door and was fully on the sidewalk in front, Stukes was already in full flight toward the street corner with his back to Detective Borona. *Id.* at 9:48:28.

Detective Borona yelled "police" and "drop the gun," Doc. #107-2 (¶ 16), and he fired once at Stukes, hitting him in the legs as Stukes was rounding the corner. Just after Stukes rounded the corner while still on the sidewalk on Benham Avenue by the side of the corner store, he fell to the ground, and his hat, the rifle, and another small object fell in front of him. The video shows the rifle sliding several feet forward down the sidewalk, colliding with a signpost, then spinning in part to end up lying on the sidewalk inches from the sign post and parallel to the curb inches away, next to the back wheel of a parked car. Ex. A-1 at 9:48:29-31.

Because of Stukes' rounding of the corner with Detective Borona some distance behind him, it is unclear from the video—and the point of greatest dispute between the parties—whether Detective Borona was in a position to see or hear the rifle fall or whether, if he was in such a position, he actually knew or realized that Stukes was no longer armed with the rifle. At one particular framepoint in the video, Stukes is still on the ground, while the rifle is still moving and in contact with the signpost, and Detective Borona's shoulders are already turned as if he has rounded the corner, such that plaintiff has a strong argument that Detective Borona was in a position to see Stukes' loss of the rifle. *Id.* at 9:48:30. Viewing the facts as I must at this stage in the light most favorable to plaintiff, I must assume for present purposes that Detective Borona knew that Stukes had dropped the rifle and knew that he no longer had it in his possession.

The video shows Detective Borona coming into view one second later on Benham Avenue about a half a car's length behind Stukes who was immediately back on his feet and who resumed running away straight down the Benham Avenue sidewalk. *Id.* at 9:48:31. Detective Borona still had his gun in both hands leveled in a ready-to-fire position at Stukes as he fled. Detective Borona continued about a car's length down the sidewalk next to the signpost where

the rifle lay on the ground. At that point, Detective Borona shot again at Stukes, causing Stukes' left arm to fly up. *Id.* at 9:48:33.

Although Stukes continued to run away down the street and out of camera view, this second shot by Detective Borona hit Stukes in the back and soon proved fatal after Stukes collapsed some distance away. The video shows that a total of eight seconds elapsed between when the door to the store first opened for Detective Borona to emerge at 9:48:25 and when Detective Borona fired the second and fatal shot at 9:48:33.

After Detective Borona's second shot he almost immediately stopped the pursuit of Stukes. *Id.* at 9:48:34. He turned around to his right and appears in the video to see Stukes' girlfriend coming down the sidewalk toward him and then to look down to his left at the rifle where it was lying next to the signpost and curb on the sidewalk. *Id.* at 9:48:36. This is the first point in the video where it is clear that Detective Borona turned his head downward in the direction of the rifle on the ground.

For the next 30 seconds or so, Detective Borona paced around with his gun in the same area, looking around and looking down at the sidewalk, at which point he removed his radio from a waistband and appeared to speak into it. *Id.* at 9:49:03. About two more minutes passed with Detective Borona maintaining his same position in this area, repeatedly looking down toward the rifle and at Stukes' hat, before more police officers arrived. *Id.* at 9:51:21.

Plaintiff in her capacity as administratrix of the estate of Stukes has filed this lawsuit against Detective Borona, Police Chief Joseph Gaudett, and the City of Bridgeport alleging an amalgam of federal and state law claims.[3] All three defendants have moved for summary judgment.

---

[3] Count One of the amended complaint alleges negligent wrongful death against Detective Borona in violation of Conn. Gen. Stat. § 52-555 for negligently shooting Stukes. Count Two alleges negligent wrongful death against

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Fourth Amendment claim against Detective Borona*

I will first consider plaintiff's Fourth Amendment claim for excessive force against Detective Borona. As for any such claim against a police officer in the context of a § 1983 lawsuit for money damages, I must consider whether the police officer has violated the Constitution and, if so, whether the police officer is entitled to qualified immunity. Of course, a court has discretion to skip the constitutional question and simply address the application of qualified immunity (*i.e.*, whether any constitutional violation amounted to a violation of clearly established law of which any objectively reasonably officer would have been aware). *See*

---

Detective Borona in violation of Conn. Gen. Stat. § 52-555 for negligent failure to provide medical treatment. Count Three alleges reckless wrongful death against Detective Borona in violation of Conn. Gen. Stat. § 52-555 for recklessly shooting Stukes and recklessly failing to provide medical treatment. Counts Four and Five allege indemnification against the City of Bridgeport pursuant to Conn. Gen. Stat. § 52-557n(a)(1) and § 7-465. Counts Six and Seven allege claims against Bridgeport police chief Joseph Gaudett for negligent hiring of and negligent supervision of Detective Borona. Count Eight alleges a federal law claim against Detective Borona under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment. Lastly, Count Nine alleges a federal claim against the City of Bridgeport under 42 U.S.C. § 1983 for a city practice, policy, or custom that caused Detective Borona's use of excessive force.

*Pearson v. Callahan*, 555 U.S. 223, 242 (2009). But I won't do that here. Bryan Stukes is dead.

And Detective Borona is accused of a very serious violation of constitutional rights. In such life-

and-death cases and where a court's ruling has important expressive value and may offer

guidance for future life-and-death cases, a court should ordinarily err in favor of addressing the

merits of a constitutional claim rather than simply defaulting to consider qualified immunity.[4]

*The Fourth Amendment and the Use of Deadly Force*

The Fourth Amendment protects the rights of the people "to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV.

Because the Fourth Amendment protects against unreasonable seizures, it has long been

recognized that the Fourth Amendment is violated if the police use excessive force against a non-

sentenced person for the purpose of arresting or restraining his or her freedom of movement. *See,*

*e.g.*, *Graham v. Connor*, 490 U.S. 386 (1989).

As the Supreme Court has explained, whether police officers' use of force is "excessive"

must be judged by "whether the officers' actions are objectively reasonable in light of the facts

and circumstances confronting them, without regard to their underlying intent or

motivation." *Id.* at 397. Moreover, "[t]he 'reasonableness' of a particular use of force must be

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact

that police officers are often forced to make split-second judgments—in circumstances that are

---

[4] In my view, it is more important still that an appellate court reach the merits of serious constitutional claims involving lethal force or other very significant police actions. *See generally Lawson v. Hilderbrand,* 2016 WL 3039710, at *3 (D. Conn. 2016) (discussing multiple reasons why it is helpful for appellate courts to address by published ruling the merits of serious Fourth Amendment claims involving police intrusion into the home rather than defaulting to application of qualified immunity).

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court issued a landmark ruling to clarify the specific constitutional standard that should govern the police when choosing whether to use deadly force against a fleeing suspect. At the outset, the Supreme Court observed that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable," because "[i]t is not better that all felony suspects die than that they escape." *Id.* at 11. Instead, the Court held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Ibid.* Put differently, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Ibid.*

Thus, the Supreme Court announced the following standard to govern whether a police officer may resort to the use of deadly force against a fleeing suspect: "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Ibid.* The Second Circuit has likewise announced and followed this same standard: "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (same).[5]

---

[5] The Second Circuit's decision in *O'Bert* was ten years before the shooting in this case and remains good law for other deadly force cases in the Second Circuit. *See Callahan v. Wilson*, 863 F.3d 144, 148 (2d Cir. 2017)*, cert. denied*, 138 S. Ct. 1261 (2018); *Rasanen v. Doe*, 723 F.3d 325, 333–34 (2d Cir. 2013).

Before I turn now to considering how that standard applies here, there are three additional considerations that guide how I must view the evidence before me. The first is a temporal one. When assessing the lawfulness of Detective Borona's actions, I must keep in mind that "[t]he objective reasonableness inquiry, for purposes of either Fourth Amendment liability or qualified immunity, depends only upon the officer's knowledge of circumstances *immediately prior to and at the moment that he made the split-second decision to employ deadly force*." *O'Bert*, 331 F.3d at 336–37 (emphasis added; internal quotations and citation omitted).

This temporal rule of immediacy cuts both ways. On the one hand, it means I cannot attribute after-the-fact knowledge to Detective Borona to judge his actions in hindsight. A judge's job is not to "Monday morning quarterback" the decisions that an officer makes in the heat of the moment.

On the other hand, the rule of immediacy means that I may not indulge implicit or explicit assumptions about the time that it takes a police officer to realize or "process" what was happening. So, for example, the fact that events occur quickly is no excuse for a court to justify what a police officer does on grounds that the officer didn't have enough time to realize what was happening (*i.e.*, in this case, to assume that Detective Borona is entitled to the benefit of some indefinite "lag" time to process and understand the significance of Stukes' dropping of the rifle). If I let such temporal assumptions contaminate my analysis at the summary judgment stage, then I would not be honoring the obligation to view the evidence in the light most favorable to plaintiff. And I would surely be usurping a jury's proper role to decide if Detective Borona had enough time to realize that Stukes had dropped the rifle before deciding to shoot him again. Judges are not cognitive psychologists, and neither the Fourth Amendment nor qualified

immunity doctrine license them to speculate that a police officer did not have enough time to understand the significance of events as they in fact occurred.

Nor is any of the foregoing inconsistent with the proposition as discussed by the Supreme Court in *Graham v. Connor* that deference is owed to police officers when they are called to act in response to rapidly evolving circumstances. It is one thing to give latitude to an officer's choice of actions when confronted with fast-moving events and yet another thing to make factual assumptions about what it is that the officer actually realized on the basis of events occurring quickly around him (or what an objectively reasonable officer would have realized on the basis of events). If there is fundamental uncertainty about what the officer or an objectively reasonable officer would have realized or "processed," then the proper course is for there to be evidence presented at trial on this issue so that the jury may make appropriate factual determinations and so that the Court in turn may reconsider the issue of qualified immunity in light of the jury's factual determinations.

That brings me to the second consideration: the *absence* of evidence from Stukes who is now deceased. As the Second Circuit has observed, when a police officer uses deadly force, a "difficult problem" arises, because "the witness most likely to contradict the police officer's story—the person shot dead—is unable to testify." *O'Bert*, 331 F.3d at 37 (internal quotations and citation omitted). In such circumstances, a court "'may not simply accept what may be a self-serving account by the police officer' but must instead 'consider circumstantial evidence that, if believed, would tend to discredit the police officer's' version and must 'undertake a fairly critical assessment of, *inter alia*, the officer's original reports or statements . . . to decide whether the officer's testimony could reasonably be rejected at a trial." *Soto v. Gaudett*,  862 F.3d 148, 157 (2d Cir. 2017) (quoting *O'Bert*, 331 F.3d at 37). That is what I will do here. I understand

Detective Borona's insistence that he did not know that Stukes had dropped the gun at the time that he fatally shot him, but I must evaluate whether the other evidence of record is enough to raise a genuine fact issue about what in fact Detective Borona knew.

The third initial consideration is about the fact that this case involves compelling video evidence. As the Supreme Court has made clear, there may be times when video evidence is so conclusive that it warrants the grant of summary judgment even in the face of contradictory witness statements. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (no genuine issue of fact for trial where video evidence of circumstances of police chase "blatantly contradicted" plaintiff's self-serving testimony). Still, video evidence may often prove inconclusive. Video evidence may be subject to physical limitations because of lighting, because of image resolution, because of the limited scope of a camera frame, and because of optical distortion that depends in part on the distance and angle from which a video is captured. *See, e.g.*, Jennifer L. Mnookin*, Semi-Legibility and Visual Evidence: An Initial Exploration*, Law, Culture & Human. (2012) (surveying physical "semi-legibility" limits on visual images used as evidence). Moreover, however tempting it may be to trust a compelling video depiction of the events at issue, judges should be wary not to over-trust video in a manner that ends up privileging and interjecting their subjective and contestable interpretive preferences about what the imagery from a video actually means. *See generally* Yael Granot, Emily Balcetis, Neal Feigenson & Tom Tyler, *In the Eyes of the Law: Perception Versus Reality in Appraisals of Video Evidence*, 24 Psychol. Pub. Pol'y & L. 93 (2018); Dan Kahan, David A. Hoffman & Donald Braman, *Whose Eyes Are You Going to Believe?* Scott v. Harris *and the Perils of Cognitive Illiberalism*, 122 Harv. L. Rev. 837 (2009).

Detective Borona shot Stukes two times under different and changing circumstances, I will consider the two shots separately. The first shot occurred within just a second or two of

Detective Borona's emergence from the store after he had been told that there was someone with a gun outside and after he came to the glass door and necessarily saw from just a few feet away that Stukes was armed with a large rifle in a manner that any reasonable police officer would have perceived to pose an imminent risk of death to both Davis and Stukes' girlfriend. Detective Borona had clear-as-day probable cause to believe that Stukes posed an imminent threat of death or serious physical injury to himself or others.

Nor did Stukes initially drop the rifle when told by Detective Borona to do so. He fled instead. Because Stukes retained the rifle in his hands as he raced toward the street corner, he remained a threat notwithstanding the fact that he was now fleeing and with his back to Detective Borona. It is clear to me that Detective Borona did not violate the Fourth Amendment when he fired his first shot at Stukes.[6]

But the same can't be said about Detective Borona's second shot. It was fired *after* Stukes dropped the rifle and—viewing the facts as I must in the light most favorable to plaintiff—after Detective Borona knew that Stukes had dropped the rifle. Although Detective Borona maintains he could not and did not see Stukes drop the rifle, the video does not conclusively establish what he could or could not see, much less does it establish what he actually saw and realized. What the video shows is Detective Borona advancing at least a car's length down the sidewalk right next to where the rifle lay before then firing the second and fatal shot.

True enough, the video does not show Detective Borona looking down toward the rifle before he took his second shot. But it does show that very soon after the second shot he stopped

---

[6] The amended complaint alleges only that Detective Borona's final shot at Stukes was a violation of the Fourth Amendment. *See* Doc. #1-1 at 21 (¶ 47). Accordingly, not having alleged that the first shot at Stukes while he was still armed was in violation of the Fourth Amendment, plaintiff has no grounds to argue to the contrary at this time.

the pursuit and turned to look at the rifle on the ground. His actions are arguably consistent with his knowing beforehand that the rifle had been dropped there. For that matter, it took another 30 seconds after Detective Borona fired the second shot for him to use his radio to call for help or reinforcements and despite the fact that—as the video shows—Stukes continued to run away even after Detective Borona shot him a second time. This delay in alerting other police units supports an inference that Detective Borona knew that Stukes was unarmed and no longer posed an immediate continuing danger.

All in all, a genuine fact issue remains about whether Detective Borona knew that Stukes had dropped the rifle. To the extent that Detective Borona might suggest there were other reasons to believe Stukes was dangerous even without the rifle, the evidence is scant and readily contestable on this point as well. Because there is a genuine fact issue about whether Detective Borona had probable cause to believe that Stukes was armed or imminently dangerous at the time that he shot him for a second time, it follows that a genuine fact issue remains for trial about whether Detective Borona used excessive force in violation of the Fourth Amendment.

*Qualified Immunity*

Now even assuming Detective Borona violated the Fourth Amendment, I must further consider whether he is entitled in any event to the benefit of qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In this manner, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.*" Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (internal quotations omitted).

Qualified immunity protects a police officer from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Thus, an official is entitled to qualified immunity if, on the basis of the facts known to the official when he or she engaged in the conduct at issue, "officers of reasonable competence could disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 164–65 (2d Cir. 2010).

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if the decisions of the Supreme Court or the "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018) (same).

The qualified immunity doctrine is doubtlessly most easily applied when one side or the the other can cite a prior case with virtually identical facts. But that's a lot to ask in terms of

coincidence. And it's a shaky proposition as well to presume that police officers devote themselves like fastidious law students to monitoring appellate court opinions for the latest nuances in fact-laden developments of Fourth Amendment law. That is why for qualified immunity purposes there need not necessarily be a case right on point, because "officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances, and there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018) (internal brackets, quotations, and citations omitted).

As discussed above, since the Supreme Court's decision in *Tennessee v. Garner*, it has been clear that a police officer may not use deadly force against a fleeing suspect unless the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert*, 331 F.3d at 36 (citing *Garner*). Moreover, in the qualified immunity context, if the substantive Fourth Amendment standard requires a determination of probable cause, a police officer is entitled to qualified immunity so long as there is even *arguable* probable cause. *See, e.g.*, *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016).

Although the *Garner* rule is itself a constitutional sub-rule of the more general rule that a police officer may not use objectively unreasonable force, the Supreme Court has cautioned that—absent a so-called "obvious case"—the *Garner* rule may be too general a guide for whether an officer's use of force violated clearly established law. *See Kisela v. Hughes*, __U.S.__, 138 S. Ct. 1148, 1153 (2018) (*per curiam*) (noting that "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious

case") (internal quotation marks omitted); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (same).

Fair enough. I will consider in light of the facts of *Garner* and other cases whether an objectively reasonable police officer would have known as of April 2013 that the Constitution does not permit him to kill a fleeing suspect after the officer sees the suspect lose or abandon his weapon. Most significantly, the facts of *Garner* itself are similar, because they concerned the shooting of a fleeing unarmed suspect from the scene of a nighttime burglary when the officer was "reasonably sure" and "figured" that the suspect was unarmed. *See* 471 U.S. at 3. It is true that there was no evidence in *Garner* that the suspect was *ever* armed, but—as discussed above—the relevant issue is what was known to the officer *at the time* of the shooting, and here (viewing the facts in the light most favorable to plaintiff) Detective Borona no longer had any basis to believe that Stukes was armed when he shot Stukes for the second and fatal time.

That makes *Garner* not legitimately factually distinguishable for present purposes. At the least, the facts and holding of *Garner* "clearly foreshadow" the application of the Fourth Amendment to this case. *See Terrebisi*, 764 F.3d at 231. What the Supreme Court said in *Garner* holds equally true here: "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.

If the facts of *Garner* weren't clear enough, consider the facts before the Second Circuit in 2003 in *O'Bert ex rel. Estate of O'Bert v. Vargo*, *supra.* The police received a report that O'Bert was beating a woman in the parking lot of a trailer park, and they confirmed this from the victim when they arrived on the scene. 331 F.3d at 33. O'Bert holed up inside his trailer, and "when the officers threatened to enter the trailer to arrest him, O'Bert yelled, 'I will blow your

fucking heads off.'" *Ibid.* But the officers looked into the trailer and saw that O'Bert was not armed, so they entered the trailer. Moments later after one of the officers "made a sudden movement forward in an attempt to grab O'Bert, and [when] O'Bert turned in response to [the officer's] lunge," another officer shot and killed him. *Id.* at 34.

The Second Circuit concluded on these facts that the officers were not entitled on summary judgment to qualified immunity. Despite the officers' insistence that O'Bert had just threatened to blow the officers' heads off, the Second Circuit concluded that this argument "focuses on the wrong period of time," because "the objective reasonableness inquiry must focus on [the officer's] knowledge of the circumstances immediately prior to and at the moment of his decision to use deadly force." *Id.* at 40. "The earlier threat did not give [the officer] license to shoot to kill a man he knew, immediately before and at the moment of the shooting, was unarmed." *Ibid.* Thus, "[o]n plaintiff's version of the facts, in which [the officer] shot to kill O'Bert while knowing that O'Bert was unarmed, it is obvious that no reasonable officer would have believed that the use of deadly force was necessary." *Ibid.*

This is the same kind of obvious case (if I credit plaintiff's version of the facts). Even though Stukes had previously been armed, Detective Borona knew him no longer to be armed when he advanced up the sidewalk and then shot him for the second time. On plaintiff's version of the facts, no reasonable officer would have believed the use of deadly force to be necessary. *See also Bouggess v. Mattingly*, 482 F.3d 886, 891–92 (6th Cir. 2007) (denying qualified immunity at summary judgment for officer who shot and killed a fleeing felon who had violently resisted arrest but who the officer officer had no basis to conclude was armed); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003) (denying qualified immunity at summary judgment to officer who fired deadly shot at motorist because of factual dispute about

whether motorist was driving at officer; "Breen would be entitled to qualified immunity if he reasonably believed at the moment he fired at Cooper that she posed a significant threat of death or serious physical harm to him or others. But this question——whether it was reasonable for Breen to believe that his life or person was in danger——is the very question upon which we have found there are genuine issues of material fact").[7]

I am not persuaded to the contrary by any of the cases that Detective Borona cites. For one thing, most of the cases he cites issued after the shooting occurred in this case in April 2013. The doctrine of qualified immunity requires a court to evaluate what law was clearly established at the time of the incident in question, not several years later.

Detective Borona cites *Scott v. Harris*, *supra*, and *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), both cases involving police use of force against suspects who led them on Hollywood-style high speed car chases that posed a continuing danger to bystanders. Here, by contrast, there

---

[7] On the basis that Stukes' threatening conduct with the rifle would have qualified for prosecution as "Threatening in the First Degree " under Connecticut law, Conn. Gen. Stat. § 53a-61aa, it could be argued that Detective Borona's conduct comes within the scope of a sentence from *Tennesee v. Garner* stating that "if the suspect threatens the officer with a weapon *or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm*, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." 471 U.S. at 11–12 (emphasis added). Viewed in context, however, this language does not license law enforcement officers to kill anyone who flees after having committed any kind of crime that involves the infliction or threat to inflict serious physical harm. The immediately preceding language in *Garner* makes clear that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so," and that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11. Accordingly, the focus is on the right to use lethal force due to the dangerousness of the suspect at the time he is shot, not because he earlier posed a danger when committing or threatening a prior crime. If there were any doubt in this regard, it was settled in *O'Bert* where the Second Circuit denied qualified immunity for the shooting of an unarmed man despite the fact that police had confirmed that the man had just beaten a woman in the parking lot outside his trailer home and had threatened the police that he would blow their heads off if they entered his home. *See also Woodward v. Town of Brattleboro*, 148 F. App'x 13, 14 (2d Cir. 2005) (noting that "[d]eadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" and that "[t]he threat must be immediate"). Detective Borona does not cite any cases interpreting *Garner* to allow the police to kill anyone who has committed a crime involving infliction of or threatened infliction of serious physical harm (*e.g.*, a bar fight or a threatening phone call) merely because the person flees unarmed from the scene and refuses police orders to stop.

was no car chase or anything about Stukes' unarmed flight on foot that posed a continuing danger to the public.

Equally distinguishable is the Supreme Court's very recent decision in *Kisela*, 138 S. Ct. at 1152–1154, in which the Supreme Court concluded that an officer who shot and killed a woman with a large knife was entitled to qualified immunity. The Supreme Court's decision turned on evidence that the woman refused to drop the knife despite repeated commands to do so, such that the officer who shot her reasonably believed she would use the knife on another person standing six feet away. *Id.* at 1153. The evident difference between this case and *Kisela* is that the suspect in *Kisela* continued to be armed when the police decided to shoot her.

Detective Borona next relies on an unpublished decision from the Fourth Circuit that long post-dates the shooting in this case. In *Jones v. Gross*, 675 F. App'x 266 (4th Cir.), *cert. denied*, 137 S. Ct. 2298 (2017), the Fourth Circuit allowed qualified immunity for the shooting of an unarmed fleeing suspect. Although the suspect was not armed, there was ample evidence for the police to believe that he was armed in view that the police had just disrupted an armed robbery where one of the accomplices had a gun to a victim's head. Here, by contrast, if the jury were to conclude that Detective Borona knew before shooting him a second time that Stukes had discarded the rifle, then it remains a fact issue whether Detective Borona (or any objectively reasonable police officer) had arguable probable cause to believe that Stukes posed a continuing danger.[8]

---

[8] The parties do not cite the recent decision of the Ninth Circuit in *Easley v. City of Riverside*, 890 F.3d 851 (9th Cir. 2018), in which a divided panel affirmed a grant of qualified immunity for an officer who shot a fleeing suspect within two to four seconds after the suspect discarded a gun while being chased by the officer. Because *Easley* had not been decided as of the date of the events at issue in this case, it does not have bearing on the "clearly established law" analysis for purposes of qualified immunity. Moreover, the facts in *Easley* are distinguishable because the suspect engaged in a throwing action while discarding the gun, such that it would have allowed "a reasonable officer [to] have reasonably feared that [the suspect] had a gun and was turning to shoot him." *Id.* at 857. To the extent that Detective Borona might otherwise rely on the reasoning of the *Easley* majority opinion, I agree with the views well-

In short, when viewing the facts in the light most favorable to plaintiff, I conclude that they do not allow for the grant of qualified immunity at this time. If Detective Borona knew that Stukes was unarmed and did not have other arguable probable cause to believe that Stukes posed an imminent danger to others, then the use of deadly force on Stukes violated clearly established law, and no objectively reasonable police officer would have resorted to the use of deadly force to kill Stukes as he was running away.

### *State law claims against Detective Borona*

As to plaintiff's wrongful death claims arising from Detective Borona's shooting of Stukes, Detective Borona's memorandum of law only cursorily argues that "[b]ecause constitutionally permissible lethal force cannot properly support claims for negligence and recklessness, plaintiff's causes of action must fail." Doc. #103-1 at 16. Because this argument concedes that the disposition of these state law claims depends entirely on the Fourth Amendment claim and because Detective Borona makes no other argument why the wrongful death claims involving his shooting of Stukes should be dismissed at this juncture, I will deny summary judgment as to the wrongful death shooting claims in light of my denial of summary judgment as to the Fourth Amendment claim. On the other hand, insofar as plaintiff alleges that Detective Borona negligently failed to provide medical treatment, I will grant summary judgment, because plaintiff has now expressly abandoned this claim.

### *Claims against Police Chief Joseph Gaudett*

Former Bridgeport Police Chief Gaudett has separately moved for summary judgment as to the two claims asserted against him under Conn. Gen. Stat. § 52-557n(a)(1)(A) for negligent hiring and supervision of defendant Detective Borona. Plaintiff has failed to file any objection or

_____

stated by the dissenting judge why it was not appropriate to grant qualified immunity at the summary judgment stage.

response to this motion for summary judgment. Accordingly, I will grant the motion for summary judgment for substantially the reasons set forth in Gaudett's motion. Doc. #15-1 at 30–32. Moreover, in light of plaintiff's counseled decision to respond only to Detective Borona's motion for summary judgment but not to Gaudett's motion for summary judgment, I conclude that plaintiff has abandoned his claims against Gaudett. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197–98 (2d Cir. 2014).

### Claims against the City of Bridgeport

The City of Bridgeport moves for summary judgment as to plaintiff's § 1983 claim against it pursuant to *Monell v. Dept. of Soc. Services*, 436 U.S. 658 (1978) (allowing for liability against a municipality on the basis of an individual officer's violation of constitutional rights if caused by a policy, practice, or custom of the municipality). Plaintiff has failed to file any objection or response to the City's motion for summary judgment. Accordingly, I will grant the City's motion for summary judgment as to the *Monell* claim for substantially the reasons set forth at length in the City's motion. Doc. #105-1 at 15–29. Moreover, in light of plaintiff's counseled decision to respond only to Detective Borona's motion for summary judgment but not to the City's motion for summary judgment, I conclude that plaintiff has abandoned his *Monell* claims against the City. *See Jackson*, 766 F.3d at 197–98.

The City also seeks dismissal of the indemnification claims as alleged in Counts Four and Five of the complaint and that are premised solely on any liability that may be imposed against Detective Borona. The City makes no argument why I should dismiss the indemnification claims other than its view that there is no underlying basis for liability against Detective Borona in the

first place. Doc. #105-1 at 36.[9] Nor does the City address the exceptions that apply to discretionary act immunity. *See, e.g.*, *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 366–68 (D. Conn. 2008) (denying dismissal of municipal liability under Conn. Gen. Stat. § 52-557n and indemnification under Conn. Gen. Stat. § 7-465 where genuine issue for trial remained on Fourth Amendment excessive force claim). In light of the fact that I am allowing the Fourth Amendment and related state law wrongful death claims against Detective Borona to proceed, I will deny as premature the City's motion to dismiss these derivative claims for municipal liability or indemnification under Conn. Gen. Stat. § 52-557n(a)(1) and § 7-465 without prejudice to the City's raising of clarified arguments against municipal liability at trial.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part defendants' motions for summary judgment (Docs. #103 and #105). The Court GRANTS summary judgment as to the following counts: all of Count Two against Detective Borona (negligent failure to provide medical treatment); part of Count Three against Detective Borona (insofar as it alleges in part reckless wrongful death from failure to provide medical treatment); all of Counts Six and Seven against Chief Gaudett (negligent hiring and negligent supervision of Detective Borona); and all of Count Nine against the City of Bridgeport (*Monell* § 1983 liability). The Court DENIES summary judgment as to the following counts: all of Count One against Detective Borona (negligent wrongful death); part of Count Three against Detective Borona (insofar as it alleges in part reckless wrongful death from shooting); all of Count Four against the City of Bridgeport (municipal liability under Conn. Gen. Stat. § 52-577n(a)(1)); all of Count Five

[9] Although another portion of the City's briefing (Doc. #105-1 at 34–36) addresses its immunity under Conn. Gen. Stat. § 52-557, this discussion appears limited to only the City's potential liability for the negligent hiring or supervision claims as made against Gaudett.

against the City of Bridgeport (indemnification pursuant to Conn. Gen. Stat. § 7-465); and all of Count Eight against Detective Borona (§ 1983 liability for use of excessive force in violation of the Fourth Amendment). Chief Gaudett is dismissed as a defendant in this case.

It is so ordered.

Dated at New Haven this 29th day of August 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge